## In re STRASSBURGER.

District Court, S. D. New York.
Oct. 10, 1935.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (Charles M. Spofford, of New York City, of counsel), for Horace L. Hotchkiss, Jr.

Zalkin & Cohen, of New York City (Franklyn M. Stone, of New York City, of counsel), for trustee.

Randolph Harris, of New York City, for claimants.

PATTERSON, District Judge.

The bankrupt formerly owned a seat on the New York Stock Exchange. The net proceeds of the sale of the seat, $76,000, came into the hands of the trustee in bankruptcy. The firm of Bainbridge & Ryan, in which the bankrupt had been a partner, filed a petition in reclamation claiming that the proceeds of sale belonged to the firm. One of the grounds of claim was that the question of ownership of the seat had been the subject of an arbitration prior to the bankruptcy of Strassburger, and that the arbitrators had decided that the seat belonged to the firm. The referee, after taking testimony on all phases of the matter, held that the decision of the arbitrators was valid and binding on the bankrupt and on the trustee in bankruptcy; accordingly, he awarded the fund to the firm. He did not pass on the other grounds of the claim.

1. The first question is whether the decision in arbitration was a valid one.

The facts relative to the arbitration are these: The bankrupt acquired his seat in 1923. In 1927 the limited partnership of Bainbridge & Ryan was formed; the bankrupt and others being general partners and one Hotchkiss being a limited partner. The contribution of Hotchkiss was $100,-000. The partnership was renewed in 1929. In 1931 the financial condition of the firm became too precarious to permit continuance of business, and an agreement of liquidation was made. At this time a dispute arose as to whether the Stock Exchange seat was the bankrupt's individual property, subject, however, to the claims of firm creditors, or whether it was an asset of the firm for all purposes. If the former, it was evident that Hotchkiss had lost altogether his contribution as limited partner. If the latter, Hotchkiss would regain a large part of his contribution. Those directly affected by the controversy were thus Hotchkiss and the bankrupt. The general partners other than the bankrupt, while having no financial interest in the question, sided with Hotchkiss, insisting that the seat was an asset of the firm for all purposes. By written agreement the dispute was left to arbitration before the arbitration committee of the Stock Exchange. A hearing was held, and the decision of the committee, on March 22, 1932, was that the seat was an asset of the firm and available not only for payment of firm creditors, but also for repayment of the Hotchkiss contribution to capital.

The petition in bankruptcy was filed in March, 1933. Later the seat was sold. Part of the proceeds was used to pay firm debts. The balance, $76,000, was turned over to the trustee in bankruptcy, without prejudice to the rights of the firm and of Hotchkiss.

If the arbitrators' award was binding on the bankrupt, it is of course binding on his successor, the trustee in bankruptcy. The trustee urges that the award was not binding on the bankrupt. The point chiefly relied on is that the arbitrators took no oath, and the bankrupt did not in writing waive the taking of an oath by the arbitrators. The evidence is that no oath was taken by the arbitration committee; that no written waiver of oath was filed by the bankrupt, although his opponents did file written waivers; that it is the practice of the committee not to take an oath; that it is likewise the practice not to require written waivers of oath from parties who are members of the Stock Exchange, but only from parties who are not members.

The statute of New York relative to arbitrations is that arbitrators shall take an oath, "unless the oath is waived by the written consent of the parties to the submission or their attorneys." Civil Practice Act N. Y. § 1452. The requirement is applicable both to statutory arbitrations and to so-called "common-law" arbitrations, and without either oath or written waiver an award in arbitration is void. Hinkle v. Zimmerman, 184 N. Y. 114, 76 N. E. 1080. The rule of written waiver has been termed a rule of evidence; in other words, a writing is the only medium whereby waiver of the arbitrators' oath may be judicially proved.

The referee held that when the bankrupt signed the constitution of the Stock Exchange on his admission, and again when he signed the agreement for arbitration, he made written waiver of the oath; this because of the custom of not requiring a written waiver of oath in the case of a member. I am of opinion that this line of reasoning is untenable; that there was no written waiver of oath signed by the bankrupt. The bankrupt, by signing the constitution and again by signing the arbitration agreement, did agree in writing to arbitrate, and if the practice of not requiring waiver of oath from members had been embodied in the constitution or in a written rule of the Exchange, the bankrupt's signature to the constitution and to the agreement might constitute a written waiver of oath, on the theory that the written rule and the bankrupt's signature to papers binding him to arbitrate should be read together. But the practice of not taking a written waiver from members was evidenced by nothing in writing. The claimants were forced to rely on oral proof in their effort to prove a waiver, and oral proof is what the law of New York forbids. A custom directly opposed to the command of a statute is a custom without legal effect. Walker v. Western Transportation Co., 3 Wall. 150, 18 L. Ed. 172; Colgate v. Pennsylvania Co., 102 N. Y. 120, 6 N. E. 114. It is as if the claimants were suing on a contract required to be in writing by the statute of frauds, and instead of proving a writing tendered

proof of a custom to disregard the statute of frauds. See Calvert v. Schultz, 143 Mich. 441, 106 N. W. 1123. The New York Legislature in its wisdom has made it the law that there shall be either an oath by arbitrators or a written waiver of oath by the parties or their lawyers, and it is beyond the power of the Stock Exchange to repeal that law. The fact is that the bankrupt never signed a written waiver of' oath. There having been no oath by the arbitrators and no written waiver of oath by the bankrupt, the arbitrators' award must be held void.

2. The award in arbitration being out of the case, the controversy must be determined on the merits.

The limited partnership of Bainbridge & Ryan was created by articles dated December 27, 1927, to continue for two years. The clause relative to firm · capital provided that the general partners would contribute the balances standing to their credit on the books of the pre-existing firm; that Hotchkiss as limited partner would contribute $100,000. As to the bankrupt, there was this provision: "Said Perry B. Strassburger, as an additional contribution by him to the capital of the partnership herein provided hereby agrees to hold and employ his membership in the New York Stock Exchange for the sole benefit of said partnership, and all the parties hereto agree that the value of said membership for the purpose of fixing the capital contribution of said Perry B. Strassburger is the sum of $150,000. Said Perry · B. Strassburger hereby agrees that by contributing the use of his membership in the New York Stock Exchange said membership, insofar as it is necessary for the protection of the creditors of said partnership and subject to the constitution of said Exchange, shall be an asset of said partnership."

It was provided that capital contributions were to draw 6 per cent. interest; Hotchkiss thereafter to receive 4 per cent. additional interest. The profits were to be divided among the general partners according to specified percentages. The firm was to pay all dues and fines of Strassburger as a member of the Exchange.

The succeeding articles, those of December 20, 1929, contained similar provisions. It was again set forth that Strassburger "as additional contribution" agreed to hold and employ his seat for the sole benefit of the firm. The value of $425,000 for the seat was agreed on, but under these later articles there was the additional clause that for the purpose of fixing Strassburger's capital contribution the value of the seat should be adjusted every six months according to the current selling price of Stock Exchange seats. There was the same provision that by contributing the use of the seat Strassburger agreed that it should be an asset of the partnership "insofar as it is necessary for the protection of the creditors of said partnership." Both agreements gave recognition to the priority of Hotchkiss, to the extent of his $100,000, over the general partners.

For the claimants the argument is made that the intention as expressed in both agreements was to transfer to the firm the entire beneficial interest in the seat. The argument must run to both agreements. They are quite similar, and if the seat did not become an asset of the firm under the 1927 agreement, plainly it did not under the 1929 agreement. In support of the claimants' argument there is the provision that it was the value of the seat that was stipulated as the contribution of Strassburger to capital. But there are difficulties in their argument that are too formidable. In the first place, the articles do not say that Strassburger's additional contribution is the seat. His additional contribution, as phrased in both instruments, is his agreement "to hold and employ" the seat for the firm's benefit. This seems to be an engagement to contribute no more than the use of the seat during the term of the partnership. See In re Amy, 21 F.(2d) 301 (C. C. A. 2). Any doubt on the matter seems to be removed by the later sentence, which first characterizes the contribution expressly as one of "use" of the seat and then goes on to say that "insofar as it is necessary for the protection of the creditors of said partnership" the seat shall be deemed an asset of the firm. The inference is a natural if not a necessary one that for all other purposes the seat is not to be deemed an asset of the firm. Again, if Strassburger contributed the seat under the 1927 agreement, so that it became property of the firm, why have him contribute it again in the 1929 agreement, and above all why make him a gift at the expense of the other general partners of $275,000, the difference between the value of $150,000 in the first agreement and the value of $425,-

000 in the second agreement? Finally, the 1929 provision for adjusting the value of the seat from time to time, for the purpose of varying Strassburger's capital contribution, cannot be made to fit into the claimants' theory. If we assume that the seat was made an asset of the firm by virtue of the 1927 agreement, this feature of the 1929 agreement is inexplicable. Why provide that fluctuations in property already belonging to the firm should affect the interests of one partner only? It will not do to say, as the claimants do say, that these matters in the 1929 agreement were merely the result of bargaining between the parties in 1929. The claimants are necessarily committed to the theory that the firm owned the seat from 1927 on, and if that were true Strassburger was in no position to demand heavy concessions when the time came to sit down and make the new partnership agreement in 1929.

The claimants seek comfort in the clause that the firm shall pay the dues and fines pertaining to the seat. But with the firm receiving the current gross income from the seat, there is very little significance in the firm's paying the current expenses incident to the seat.

From the provisions mentioned and from a study of the agreements as a whole, the conclusion is that while the agreements cannot be said to be free from ambiguity, under neither of them did Strassburger contribute the seat to the firm of Bainbridge & Ryan as a general asset. What he did do was to contribute the use of the seat, and also to agree that the seat should be considered an asset of the firm to the extent necessary for protection of firm creditors.

This conclusion is not rebutted by the treatment of the seat on the firm's books and in financial statements. True, the seat was carried as a firm asset on the books and in financial statements. But its value at fluctuating figures was always reflected in the capital of Strassburger, to the exclusion of the other partners. When it is borne in mind that the seat was concededly an asset of the firm so far as creditors were concerned, there is nothing in the books or in the financial statements that contradicts the effect of the partnership articles. A factor pointing toward Strassburger's ownership for general purposes is that when the number of seats was increased in 1929 and rights to part

of a seat were issued, he and not the firm got the benefit.

Were this all I would be persuaded that the claimants' case must fail. We have the further fact, however, that Strassburger repeatedly assured Hotchkiss that the seat was behind the $100,000 contribution of Hotchkiss as limited partner. The evidence is almost undisputed that whenever the firm was in a tight spot, as happened in 1929 and again in 1930, Strassburger would persuade Hotchkiss not to withdraw his capital by telling him that the seat was back of his special capital and made the firm's position a strong one. It was by such a statement that in 1930 Hotchkiss was induced to subordinate his interest to new capital brought in by Bainbridge. Strassburger in his testimony sought to tone down the assurances, but his testimony is not convincing. Full corroboration of Hotchkiss' version is found in Strassburger's statement submitted to the arbitration committee on January 25, 1932, in which Strassburger over his own signature conceded "that latterly I did make oral remarks to Mr. Hotchkiss to reassure him that my seat would stand back of his capital contribution in order to induce him to retain his capital in the firm." The making of such statements to Hotchkiss, proved by oral testimony and by Strassburger's written admission, may be taken as a settled fact.

The bankrupt's representation was that his seat stood behind Hotchkiss' limited capital. Such representation was clear and unequivocal and could only mean that the seat was considered an asset of the firm and subordinate to the interest of Hotchkiss. The bankrupt's purpose in making the representation was to induce Hotchkiss not to withdraw his limited capital, which he was at liberty to do while the firm was still solvent. The representation had its intended effect; Hotchkiss left his limited capital in the business down to liquidation. The case is one of estoppel. As to Hotchkiss, the bankrupt is estopped to say that the seat was not an asset of the firm; was not behind the contribution of Hotchkiss. "When a party, either by his declarations or conduct has induced a third person to act in a particular manner, he will not afterwards be permitted to deny the truth of the admission, if the consequence would be to work an injury to such third person, or to some one claiming un-

der him." Trustees of Brookhaven v. Smith, 118 N. Y. 634, 641, 23 N. E. 1002, 1003, 7 L. R. A. 755. See, also, In re Ideal Steel Wheel Co., 25 F.(2d) 651 (C. C. A. 2); Ash v. Honig, 62 F.(2d) 793 (C. C. A. 2). It is no answer to say that Hotchkiss himself was familiar with the partnership articles. The articles were not so explicit on their face that a layman must have construed them as excluding the seat from the firm assets.

█ The estoppel against the bankrupt is effective against the trustee in bankruptcy Aldine Trust Co. v. Smith, 182 F. 449 (C. C. A. 3); In re Ideal Steel Wheel Co., supra; Kelly v. Scott, 49 N. Y. 595; Starkey v. Almena State Bank, 130 Kan. 568, 287 P. 251. In this connection there is nothing to indicate that any individual creditor of the bankrupt except Smith relied on the bankrupt's ownership of the seat in extending credit to him. Smith, it appears, did so rely in taking the bankrupt's individual obligation in liquidation of his interest as a general partner in the firm, but he was not misled to his injury. Prior to taking the bankrupt's notes he had the position of a general partner in a firm which was on the verge of insolvency and which was obliged to suspend business three months later. His right to withdraw his capital did not mature until six months after retirement, and it was at all times junior to the right of Hotchkiss as limited partner. In fact, it was only by including the seat as an asset of the firm that the firm was solvent and that Smith was in a position to claim the right to withdraw anything. His equity is therefore weaker than that of Hotchkiss.

█ Another view leading to the same result is to take the statements of Strassburger to Hotchkiss as constituting a subordination agreement. In consideration of the latter leaving his limited capital in the firm and consenting to subordinate it to new capital brought in by one of the general partners, Strassburger agreed that his seat should be deemed a firm asset to the extent necessary for the protection of such limited capital. The agreement was initially an oral one, but was confirmed by the written statement of the bankrupt more than a year before bankruptcy.

The arbitration is of no avail to the claimants. On the merits, however, they are entitled to the fund, to be turned over to Hotchkiss to the extent that it is not re-quired to satisfy any remaining claims of firm creditors. The order of the referee directing payment to the claimants will be affirmed.